IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

MARTIN R. BUB,

                    Plaintiff,

        v.

WILLIAM SWIEKATOWSKI, JOHN DOE,          OPINION and ORDER
CAROL ROWE, ELIZABETH MASON,
MICHAEL SCHULTZ, PETE ERICKSEN,                15-cv-195-jdp
MICHAEL BAENEN, MICHAEL MOHR,
CHARLES FACKTOR, RICHARD PROCESS,
WENDY BRUNS, SAMUEL MENNING,
CHRISTOPHER STEVENS, and CHARLES COLE,

                    Defendants.[1]

Plaintiff Martin Bub, appearing pro se, is a former state of Wisconsin inmate. Bub alleges that when he was incarcerated at Green Bay Correctional Institution, defendant prison officials retaliated against him in a number of ways for defending himself against a conduct report, and for helping his girlfriend with a lawsuit against prison officials. In particular, he alleges that prison staff spiked his urine sample with cocaine and then violated his due process rights in the ensuing disciplinary proceedings. I allowed him to proceed on claims under a variety of legal theories. Both sides have filed motions for summary judgment.

I will deny Bub's motion for summary judgment because the facts provided by the parties do not show that he is entitled to judgment as a matter of law on any of his claims. I will grant defendants' motion for summary judgment on many of Bub's claims, largely because Bub fails to present facts showing that many of the defendants were personally involved in

---

[1] I have amended the caption to include defendants' full names.

retaliating against him or otherwise harassing him. But I will deny defendants' motion with regard to aspects of Bub's claim that defendant William Swiekatowski retaliated against him and his claims that defendants Samuel Menning and Christopher Stevens violated his rights under the Fourth Amendment.

## UNDISPUTED FACTS

I draw the following facts from the parties' summary judgment materials. They are undisputed unless noted otherwise.

Plaintiff Martin Bub is a former state of Wisconsin inmate. His claims concern events occurring while he was an inmate at Green Bay Correctional Institution (GBCI). Several of the defendants worked at GBCI: William Swiekatowski was a lieutenant, Richard Process and Samuel Menning were correctional sergeants, Pete Ericksen was the security director, Michael Schultz and Christopher Stevens were captains, Michael Baenen was the warden, Wendy Bruns was the program review coordinator, and Michael Mohr was a complaint examiner. Defendant John Doe also worked at GBCI. Another set of defendants are DOC officials: Charles Facktor was a corrections complaint examiner. Defendant Charles Cole was employed as the designee for the secretary of the DOC on inmate grievances. Defendants Elizabeth Mason and Carol Rowe worked at the DOC's Drug Abuse Correctional Center, located in Winnebago, Wisconsin.

On June 15, 2010, defendant Swiekatowski issued Bub a conduct report alleging that Bub's girlfriend, Kathleen Sell, was smuggling drugs into the prison for him. Bub was later found not guilty of those charges. Sell filed a notice of claim with the attorney general stating that state officials defamed her in making those accusations.

Bub says after his successful defense against the conduct report, prison staff, orchestrated by Swiekatowski, Ericksen, and Baenen, commenced a "campaign of harassment" against Bub, in retaliation for Bub successfully defending himself and for helping his girlfriend with her lawsuit against prison officials. Specifically, Bub says that he was subjected to an inordinate number of strip searches, cell searches, and urinalyses (UAs). Staff opened his outgoing mail, monitored his phone calls, and made his visits with Sell uncomfortable by often seating them at a table close to the guard desk that several cameras could watch. Defendants say that Bub was not searched or monitored any differently than any other inmate at the institution.

For instance, defendants say that from August 2010 to December 2011, Bub's cell was searched ten times, all by non-defendants. The DOC's goal is to search every cell about once a month. Bub says that there were "numerous" more cell searches that the documentation shows.

Similarly, defendants say that inmates are routinely strip searched after each contact visit they receive, and also prior to giving a urine sample for the testing of illicit substances. Non-routine strip searches are logged on a form, but Bub says that he was searched more often than is reflected on the form.

Defendants say that urinalyses are generally conducted randomly and the inmates who need to give a urine sample on any given day are chosen by a computer, not staff at Green Bay. Inmates may be subject to testing for cause if a staff member, from direct observation or reliable sources, has reasonable grounds to believe that the inmate has used, possesses, or is under the influence of intoxicating substances. The GBCI logs show no random UAs for Bub during the time in question, and one "for cause" UA discussed below. Bub says that defendants performed "numerous" more UAs than what they logged into the system.

On March 5, 2011, Bub was issued a conduct report that claimed prison staff found marijuana in Bub's cell. Bub was found guilty and given a disposition of 90 days of disciplinary separation.

On April 15, 2011, Bub filed a grievance about what he believed was harassment from defendant Ericksen. Bub said that his cell was searched frequently, he was receiving strip searches, and he was being watched closely on visits by officers under Ericksen's command. Defendants Mohr and Baenen were two of the reviewers who denied his grievance.

On June 5, 2011, Bub requested an early "program review" asking to be moved to another maximum-security prison because Bub says that he feared for his safety. Several days later, defendant Bruns denied Bub's request.

In early December 2011, an officer gave Bub legal papers belonging to Sell that had been held by another prisoner, Akimbo Hashim-Tiggs, as he helped her with her lawsuit against GBCI staff, including Ericksen and Swiekatowski. Defendants say that the legal documents were confiscated from Hashim-Tiggs because the inmates were not using the proper channels to send legal work between inmates. Swiekatowski monitored communications between Bub and Hashim-Tiggs, and at one point he read at least some mail between Sell and Bub.

Within a day or two, Swiekatowski came to Bub's cell and asked Bub if he got the legal work back. He then told Bub that "he had not forgotten about [Bub] and the promise [Swiekatowski] made to him," which Bub took as a threat.[2] Dkt. 15, at 8.

---

[2] Bub has similar but not identical versions of this quotation in his verified amended complaint, Dkt. 15, and an affidavit in support of summary judgment, Dkt. 21. Construing pro se litigant Bub's materials generously, I will include the more detailed version of the quote from the verified complaint even though it is not directly cited in his summary judgment materials.

On December 14, 2011, defendant Stevens told defendant Menning to search Bub's cell and conduct a strip search because an inmate told Stevens that Bub was acting strange at the evening meal. Bub says that he was not at this evening meal.

Menning says that he noticed unusual behavior as he interacted with Bub: he was walking unbalanced, seemed unable to focus, and his pupils darted back and forth. Bub says that none of this is true, and that he acted normally. Stevens ordered a urinalysis for Bub based on the suspicion that he was under the influence of an intoxicant. Bub says that he was not under the influence.

When Bub sought a copy of the document showing the reason for the "for cause" UA, defendants were unable to find the document. Months later they produced it, but Bub believes that this delay shows that Menning and Stevens fabricated a backdated incident report to justify the UA that was ordered.

On December 16, 2011, Bub was awakened early in the morning for a urinalysis. Bub provided the sample to defendant Process, Bub signed his name "M. Bub" on the donor line of the tamperproof seal. Bub watched Process sign his name on the collector's line of seal and then place it over the specimen cup. Both Bub and Process also signed a "chain of evidence" form. Bub's sample was sent to the DOC's Drug Abuse Correctional Center (DACC). Defendant Swiekatowski does not communicate with the personnel at DACC.

When defendant Rowe unpacked Bub's sample at DACC, she verified that the seal on the sample bottle was intact and Bub's name and the date on the bottle matched his name and the date on the chain of evidence form. Defendant Mason was the technician who cracked the seal on Bub's urine sample and pipetted the urine into the labeled test tube, ensuring that the

name, DOC number, and specimen ID number on the bottle matched with the information on the test tube.

Bub's sample returned a positive result for cocaine at DACC and again at a confirmation test at an outside lab. Part of the two-piece label seal going onto the new bottle for the portion of the sample sent for confirmation was also placed onto the chain of evidence form, showing Rowe as the "collector" of that sample. I take defendants to be saying that this is why Rowe's name, and not Process's, appeared on the label used at Bub's disciplinary hearing.

On December 22, 2011, defendant Swiekatowski put Bub in temporary lockup for testing positive for cocaine. He received a conduct report for possession of intoxicants. Bub says that he had not taken cocaine, so he could not have tested positive for it. Swiekatowski told Bub something to the effect of, "I told you I would get you, you never should have made me look bad with all of your complaints and your girl suing me. Now I am gonna bury you." Dkt. 15, at 8–9.[3]

On December 23, 2011, Bub was given a copy of his conduct report. Inmates are instructed in the conduct report documentation that the hearing will be held no sooner than two days, and generally not more than 21 days, after the date that they are given a copy of the conduct report. The hearing was initially scheduled for January 9, 2012.

Bub requested the presence of two witnesses at the hearing and the ability to review some evidence, including the chain of custody report for his urine sample and a photocopy of the urine-sample label with his signature on it.

---

[3] As with Swiekatowski's other quote discussed above, Bub has similar but not identical versions of this quotation in his verified amended complaint and an affidavit in support of summary judgment. I will again include the more detailed version of the quote from the verified complaint.

The witness requests were denied under the reasoning that the hearing was to be held during second shift, and the requested witnesses worked during the first shift. Bub was instead allowed to submit written questions to the witnesses. Security Office Operations Associate Perttu said that Bub would be able to see a copy of the tamperproof seal with his signature. At the request of Bub's advocate, the disciplinary hearing date was postponed to wait for confirmation test results and conduct further research.

Bub says that on January 18, 2012 at about 9:00 a.m., he was awakened by a first-shift sergeant who told him that his disciplinary hearing was to be held immediately. According to Bub, once he arrived at the hearing he was told that a new advocate had been assigned to the case. Bub says that he immediately objected to a new advocate, as Bub had never discussed the case with him. Bub also says that he objected to the lack of notice of the hearing.

Defendant Schultz decided to allow the hearing to proceed over Bub's objections. The advocate did not help Bub at the hearing. Bub noticed that the tamperproof seal was not the one that he and Process had signed. He argued that the sample may have become contaminated when he dropped the container during the UA. Process stated in his response to Bub's written questions that the urine sample container did fall on the floor, but that the lid did not come off. Officer Petri, who was apparently also present during the UA, stated in response to written questions from Bub that the cup fell on the floor, and that the lid remained on the cup.

Schultz reviewed the conduct report, the chain of evidence form including the tamperproof seal, the drug test results, the written responses to Bub's questions by Process and Petri, and Bub's verbal statement. He concluded that it was more likely than not that Bub used cocaine. Bub was found guilty and given a sentence of 360 days in disciplinary separation.

Following this hearing, Bub filed an appeal and multiple grievances challenging the decision, sentence, and perceived procedural shortcomings at the hearing. On August 9, 2012, through his attorney, Bub filed a petition for writ of certiorari in the Dane County Circuit Court. In May 2014, Judge Juan Colas issued an order granting the writ and directing the expungement of the conduct report because of procedural problems with the hearing. Judge Colas determined that prison officials did not give Bub proper notice of the hearing, switched his advocate without having time to prepare, and denied him witnesses based on a no longer operative rationale that they were unavailable, given the change in hearing time.

## ANALYSIS

### A.  Summary judgment

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When, as here, the parties have filed cross-motions for summary judgment, the court "look[s] to the burden of proof that each party would bear on an issue of trial; [and] then require[s] that party to go beyond the pleadings and affirmatively to establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). If either party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment against that party is appropriate. *Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) (quoting *Tatalovich v. City of Superior*, 904 F.2d 1135, 1139 (7th Cir.

1990)). "As with any summary judgment motion, this [c]ourt reviews these cross-motions 'construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party.'" *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008) (quoting *Auto. Mechs. Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc.*, 502 F.3d 740, 748 (7th Cir. 2007)).

**B. Retaliation**

I granted Bub leave to proceed on his claims that several defendants undertook a "campaign of harassment" against him for successfully defending a previous conduct report issued by defendant Swiekatowski and helping Sell with her lawsuit against Swiekatowski and Ericksen. Retaliatory actions included repeated unnecessary strip searches, cell searches, and urinalyses, excessive monitoring of his visits with Sell, the opening of his mail, monitoring of his phone calls, and the confiscation of legal materials for the lawsuit with which plaintiff was assisting Sell.

According to Bub, this retaliation culminated with a false conduct report orchestrated by Swiekatowski and approved by Ericksen. Bub alleged that defendant Doe tampered with his urine sample by putting cocaine in it, and defendants Rowe and Mason covered up the tampering during their testing of the sample. Bub also alleges that defendant Schultz gave him an excessively long sentence in part to further the retaliation from his friends Swiekatowski and Ericksen.

To succeed on his retaliation claims, Bub must establish that: (1) he engaged in activity protected by the First Amendment; (2) defendants took actions that would deter a person of "ordinary firmness" from engaging in the protected activity; and (3) the First Amendment activity was at least a "motivating factor" in defendants' decisions to take those actions. *Bridges*

*v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). In addition, the evidence must be enough to show that absent a retaliatory motive, the prison official would have acted differently. *See Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996). In *Babcock*, the court also stated that "the retaliation inquiry should be undertaken in light of the general tenor of *Sandin* [*v. Conner*, 515 U.S. 472 (1995)], which specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management. We should afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." 102 F.3d at 275 (internal quotations and citations omitted).

Bub demonstrates that he was involved in protected activity: defending himself in disciplinary proceedings and helping Sell with her lawsuit. But he struggles with the remaining portions of the test. For the most part, he is extremely vague about how defendants were personally responsible for harming him prior to the false conduct report.

### 1. Swiekatowski, Eriksen, and Baenen

I'll start with the general allegations of harassment against Swiekatowski, Eriksen, and Baenen. Bub alleged that he was given a large number of unnecessary strip searches, cell searches, and urinalyses. But at summary judgment he explains very little about when these extra searches happened. Defendants explain their procedures for routine strip searches, cell searches, and UAs that all prisoners receive, and they explain how they record non-routine searches. The DOC records do not show a large number of non-routine searches. Bub says that DOC staff did not record every search, but again, he does not really explain how often he was singled out for extra searches. At most I can conclude that there is a genuine dispute about whether Bub was searched more than defendants say he was.

But even assuming that those extra searches might dissuade someone of ordinary firmness from participating in First Amendment activity, Bub fails to show that any of the defendants were responsible for them. Bub says that other officers conducting several strip searches told him that Ericksen or Swiekatowski ordered the searches, but a party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *See, e.g.*, *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001).

Similarly, Bub says that he and Sell were made to feel uncomfortable during visits because they were almost always placed at a particular table close to the guard station. But Bub does not establish that Swiekatowski, Eriksen, or Baenen had anything to do with the table assignments. Bub says that his communications were monitored, but with the exception of a claim against Swiekatowski discussed below, he does not establish that defendants were responsible for those actions either.

Additionally, even had defendants been involved in any of these events, Bub fails to show a retaliatory motive on their part. The fact that these events followed Bub's conduct-report acquittal and his efforts to help Sell is not enough to establish a retaliatory motive. Suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506–07 (7th Cir. 2004).

At summary judgment, it is Bub's burden to show that he has evidence to support his claims. He generally fails to do that for his claims about the "campaign of harassment" orchestrated by Ericksen, Baenen, and Swiekatowski. I will grant defendants' motion for summary judgment and deny Bub's as they pertain to Bub's retaliation claims against Ericksen and Baenen.

But Bub's retaliation claims against Swiekatowski are not completely without evidentiary support. As discussed above, Bub fails to show that Swiekatowski was personally involved in all of the events he originally alleged were part of the "campaign of harassment." But he does provide proposed findings of fact suggesting Swiekatowski's involvement in some adverse decisions, as well as showing that Swiekatowski held a retaliatory animus.

It is undisputed that Swiekatowski monitored correspondence between Bub and Hashim-Tiggs. Bub says that after Sell's legal materials were confiscated from Hashim-Tiggs and given to Bub, Swiekatowski visited Bub and told him "he had not forgot about him and the promise he made to him after Bub got out of the hole," which Bub took as a threat. Swiekatowski says he did not confiscate the materials himself, but given that he was monitoring the inmates' internal correspondence and he followed with this threatening statement, a reasonable jury could conclude that Swiekatowski had a hand in thwarting Bub's and Sell's litigation efforts by keeping documents out of the hands of an inmate helping them. A possible retaliatory motive is clear given that the confiscation directly thwarted Bub's litigation efforts with Sell.

A second statement by Swiekatowski supports another aspect of Bub's retaliation claims. Bub maintains that his UA testing positive for cocaine was tampered with; he says that he did not take cocaine. The results are conclusive that Bub's purported sample did test positive. It is clear that Bub doesn't know exactly what happened, but he believes that Swiekatowski had something to do with the false positive, because when Swiekatowski placed him in TLU, he said, "see I told you I would get you, you never should have made me look bad with all of your complaints and your girl suing me. Now I am gonna bury you." Swiekatowski denied he says this, and even if he did, there is more than one reasonable inference one could

draw from the statement. But one reasonable inference is that Swiekatowski was admitting having successfully framed Bub in retaliation for Bub's First Amendment activity.

This is not going to be an easy claim for Bub to prove, in part because it is not at all clear how Swiekatowski could have accomplished the adulteration of the specimen. But defendants' proposed findings about their procedures do not foreclose it. It is undisputed that lab staff would not have tested the sample had it shown signs of tampering. They check the name of the inmate on the sample against the "chain of evidence" form, but perhaps notably, they do not appear to check the inmate's *signature* on the sample against his signature on the form. And even if they did, a signature could be forged. Thus it seems possible that someone could frame an inmate by switching out his sample for an entirely new one.

Defendants also stop short of saying that Swiekatowski had no access to samples; they simply say that he did not tamper with them and had no reason to. But I take Bub to be saying that Swiekatowski admitted to having a part in tampering with the sample, so that is a factual dispute for trial.

To be sure, there are reasonable inferences that can be drawn from these facts that could lead a jury to conclude that Swiekatowski did not retaliate against Bub. So I will deny Bub's motion for summary judgment on these claims. But I will also deny defendants' motion on Bub's claims that Swiekatowski retaliated against him by monitoring his communications, confiscating Sell's legal materials from Hashim-Tiggs, and planting cocaine in his urine sample.

### 2. Remaining retaliation claims

Bub brings several other retaliation claims. But I will deny Bub's motion for summary judgment and grant defendants' motion for summary judgment with respect to all of them.

Bub named a John Doe defendant whom he alleged actually spiked the sample, presumably on Swiekatowski's behalf, and defendants Rowe and Mason from the DOC lab. But he never amended his complaint to identify the Doe defendant, nor does he include any proposed findings suggesting that this person exists. So I will dismiss the Doe defendant.

As for Rowe and Mason, Bub does not place any of defendants' proposed findings about their role in dispute. There is no evidence suggesting that they did anything other than process the sample under their usual procedures. So no reasonable jury could conclude that they retaliated against Bub.

I granted Bub leave to proceed on a retaliation claim against defendant hearing examiner Schultz for giving him an excessively long sentence in part to further the retaliation by his friends Swiekatowski and Ericksen. But at summary judgment, Bub provides no evidence suggesting that the sentence is excessive given his previous conviction for possessing marijuana, or that Schultz acted the way he did because of friendships with other defendants or knowledge of their alleged retaliation.

I allowed Bub to proceed on claims against defendants Mohr and Baenen for denying a grievance Bub filed about Ericksen retaliating against him, because I inferred that they could have issued rulings putting a stop to Ericksen's harassment but acted with deliberate indifference by failing to do so. That is, Mohr and Baenen could have been personally involved in the retaliation by knowing about it, approving it, condoning it, or turning a blind eye to it. *See Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). But I have already concluded that Ericksen should be granted summary judgment on the retaliation claims against him, so the retaliation claims against Mohr and Baenen fail as well.

## C.  Fourth Amendment

I allowed Bub to proceed on claims against defendants Swiekatowski, Ericksen, Baenen, Process, Menning, and Stevens for violating his Fourth Amendment rights by subjecting him to repeated non-random urine tests. But as discussed above, Bub does not establish that Swiekatowski, Ericksen, or Baenen ordered any of the tests that he considered part of the "campaign of harassment" against him. And neither Swiekatowski nor Process were responsible for forcing Bub to take the December 2011 UA resulting in his conduct report: Process merely carried it out, and Bub contends that Swiekatowski later tampered with his sample. So I will grant defendants' motion for summary judgment and deny Bub's motion for summary judgment on each of those claims.

That leaves defendants Menning and Stevens. Bub alleges that they authored a false backdated incident report to give defendants pretext to collect his urine. Stevens told Menning to investigate after an inmate told him that Bub was acting strangely, and Menning wrote the incident report about Bub's confused or erratic behavior giving rise to Stevens then ordering a UA. Ultimately, whether the report was backdated is irrelevant to the claim for purposes of summary judgment. Even if defendants did not backdate the incident report, a jury could conclude that defendants acted unreasonably. Bub has created a genuine issue of disputed fact about whether defendants lied by saying that he was acting strangely; Bub says he was acting perfectly normal, so there would have been no reason to investigate him or order the UA. Defendants say that Bub cannot dispute defendants' own thoughts or perceptions, but that is incorrect. Fourth Amendment claims use an objective standard, but even if they didn't, a reasonable jury could conclude that defendants' explanation isn't credible given Bub's version of events.

Defendants contend that Bub failed to exhaust his administrative remedies on these claims. Under the Prison Litigation Reform Act, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement is mandatory and applies to all inmate suits. *Woodford v. Ngo*, 548 U.S. 81 (2006); *Porter v. Nussle*, 534 U.S. 516, 524 (2002). The exhaustion requirement's primary purpose is to alert the state to the problem and to invite corrective action. *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004).

But because exhaustion is an affirmative defense, defendants bear the burden of establishing that Bub failed to exhaust his available remedies. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Bub raised the issue of there being no cause to take his UA within the appeal of his conduct report itself, and defendants fail to develop an argument for why that did not serve to exhaust his administrative remedies. So I will not grant their motion for summary judgment on exhaustion grounds.

We are left with Bub's assertion that Menning and Stevens had no reasonable basis to order the UA, and instead ordered it to harass him. Defendants contend that they are entitled to qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Put a bit more bluntly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The doctrine translates into a two-part test: (1) whether the public official violated the plaintiff's constitutional rights;

and (2) whether those rights were clearly established at the time of the alleged violation. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). A right is "clearly established" when a reasonable official would know that his "conduct was unlawful in the situation he confronted." *Hernandez v. Cook Cty. Sheriff's Office*, 634 F.3d 906, 915 (7th Cir. 2011) (citations omitted).

The Fourth Amendment protects, "to some degree, prisoners' bodily integrity against unreasonable intrusions *into* their bodies." *King v. McCarty*, 781 F.3d 889, 900 (7th Cir. 2015) (emphasis in original). And here, unlike cases in which the real question is balancing the severity of the intrusion with the need at hand, *see Sparks v. Stutler*, 71 F.3d 259, 260–61 (7th Cir. 1995) (insertion of catheter into prisoner's bladder was subject to Fourth Amendment, but defendant physician was entitled to qualified immunity), Bub is alleging that there was absolutely *no* reason for the urinalysis beside harassment. I conclude that qualified immunity does not apply, at least for now given the factual dispute in the summary judgment materials. I will deny both sides' motions for summary judgment on the Fourth Amendment claims against Menning and Stevens.

**D.  "Class of one" equal protection**

I allowed Bub to proceed against several defendants on a "class of one" equal protection theory, because he alleged that they singled him out for harassment. A plaintiff may bring a class-of-one equal protection claim for being treated "intentionally . . . differently from others similarly situated" for no rational reason. *D.S. v. E. Porter Cty. Sch. Corp.*, 799 F.3d 793, 799 (7th Cir. 2015) (citations and internal quotation marks omitted).

Most of these claims fail for the same reasons as Bub's parallel retaliation claims. He does not raise a genuine issue of material fact about whether Ericksen, Baenen, Doe, Rowe,

Mason, or Schultz singled him out for harassment as part of his retaliation claims, so he cannot succeed on his class-of-one claims against these defendants either.

I dismissed Bub's retaliation claims against defendants Mohr and Baenen for turning a blind eye to Ericksen's alleged harassment because I concluded that Bub failed to establish that Ericksen actually harassed him. Bub's class-of-one claims against Mohr and Baenen fail for the same reason. Bub brings the same type of class-of-one claim against defendant Bruns for failing to transfer him out of GBCI after he complained about Ericksen's alleged harassment. I will dismiss that claim as well.

Also, there is no evidence that defendant Process treated Bub different than similarly situated inmates reading the UA; he was merely carrying out the order to give Bub a UA, presumably as he would for any inmate.

That leaves Swiekatowski, Menning, and Stevens regarding class-of-one claims parallel to the claims that I have already concluded survive summary judgment: a retaliation claim against Swiekatowski and Fourth Amendment claims against Menning and Stevens. Defendants contend that qualified immunity bars these claims, and I agree.

"The classic class-of-one claim is illustrated when a public official, 'with no conceivable basis for his action other than spite or some other improper motive . . . comes down hard on a hapless private citizen.'" *Swanson v. City of Chetek*, 719 F.3d 780, 783–84 (7th Cir. 2013) (citing *Lauth v. McCollum*, 424 F.3d 631, 633 (7th Cir. 2005)). It is not yet clear whether such claims are cognizable in the prison context. Some courts have applied the rule articulated in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), to bar class-of-one claims challenging arbitrary treatment by prison officials as a matter of law. *See, e.g.*, *Glassey v. Ryan*,

No. CV1201490PHXPGRESW, 2016 WL6080672, at *4 (D. Ariz. Mar. 7, 2016) (collecting cases from various circuits).

In *Engquist*, the Supreme Court held that government employees could not bring class-of-one claims challenging adverse employment actions because such actions by their nature "involve discretionary decisionmaking based on a vast array of subjective, individualized assessments." 553 U.S. at 605. Prison officials' decisionmaking functions much the same way, focused on discretionary, individualized determinations. Once the defense is raised, it is the plaintiff's burden to cite cases showing that there is a clearly established right at stake. Bub does not do so here, and that is not surprising given the dearth of law supporting such claims. So I will grant defendants' motion for summary judgment and deny Bub's motion for summary judgment on Bub's class-of-one claims.

## E. Eighth Amendment

I granted Bub leave to proceed on claims that defendants Swiekatowski, Ericksen, and Baenen violated his Eighth Amendment rights by subjecting him to humiliating strip searches for retaliatory reasons instead of legitimate prison-security reasons. But because I have already concluded that Bub fails to establish that these defendants were responsible for giving him unnecessary strip searches, I will grant defendants' motion for summary judgment and deny Bub's motion for summary judgment on these claims.

## F. Due process

Bub alleges that defendant Schultz violated his procedural due process rights in his disciplinary proceedings for use of intoxicants after his UA tested positive for cocaine. Those proceedings were ultimately vacated in a certiorari action in the Dane County Circuit Court because Judge Colas determined that prison officials did not give Bub proper notice of the

hearing, switched his advocate without having time to prepare, and denied him witnesses based

on a no longer operative rationale that they were unavailable, given the change in hearing time.

The problem for Bub in this case is that the Constitution guarantees him significantly

fewer procedural safeguards in this type of a disciplinary hearing than the Wisconsin

Administrative Code provides. As I explained in my order screening the complaint, because

Bub did not face the loss of good-time credits, he was entitled only to "informal, nonadversarial

due process" as outlined in cases like *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005) and *Westefer

v. Neal*, 682 F.3d 679, 684 (7th Cir. 2012).

The Court of Appeals for the Seventh Circuit explained further in *Westefer*:

> Informal due process requires "some notice" of the reasons for the
> inmate's placement, and enough time to "prepare adequately" for
> the administrative review . . . .
>
> . . . .
>
> In other words, only a single prison official is needed as the
> neutral reviewer—not necessarily a committee. Informal due
> process requires only that the inmate be given an "opportunity to
> present his views"—not necessarily a full-blown hearing. If the
> prison chooses to hold hearings, inmates do not have a
> constitutional right to call witnesses or to require prison officials
> to interview witnesses. . . .
>
> Nor does informal due process necessarily require "a written
> decision describing the reasons" for an inmate's placement, or
> mandate an appeal procedure.

682 F.3d at 684–86 (citations omitted).

The abrupt change in advocate and denial of live witnesses simply do not run afoul of

the Due Process Clause under *Wilkinson* and *Westefer*. Although Bub was apparently

unexpectedly rousted from bed to defend himself, no reasonable jury could conclude that he

lacked notice of the reasons for the hearing. Also, he had adequate time to prepare: he had

more time than that contemplated by the administrative code, and he had already prepared his written questions for witnesses. I suggested that Bub could bring a claim against Schultz for being biased against plaintiff in favor of his friends Swiekatowski and Ericksen, contra to the "neutral" decision-maker contemplated in *Westefer*. But as discussed above in the retaliation section, there is no evidence that Schultz acted the way he did because of friendships with other defendants. So Bub cannot succeed on a due process claim against Schultz.

I also allowed Bub to bring claims against defendants Mohr, Baenen, Facktor, and Cole[4] for their roles in denying his appeal and grievance about the retaliation, because they could have intervened to stop Schultz's violations. But I conclude that Schultz did not violate Bub's due process rights, and Bub has no independent right to appeals or a grievance procedure, so his claims against these defendants fail as well. I will grant defendants' motion for summary judgment and deny Bub's motion for summary judgment on all of his due process claims.

CONCLUSION

I deny Bub's motion for summary judgment in its entirety. But defendants' motion disposes of most of Bub's claims. The only claims remaining for trial are Bub's (1) retaliation claims against defendant Swiekatowski for monitoring his communications, confiscating legal materials, and planting cocaine in his urine sample; and (2) Fourth Amendment claims against defendants Menning and Stevens concerning the December 2011 UA. I will direct the clerk of

---

[4] Defendants recognized defendant Cole as deceased in their amended acceptance of service. Dkt. 59. No substitution was made under Fed R. Civ. P 25, but that issue is mooted by my dismissal of the claim against Cole.

court to set a scheduling conference before the magistrate judge to set a trial date and associated pretrial deadlines.

ORDER

IT IS ORDERED that:

1. Plaintiff Martin Bub's motion for summary judgment, Dkt. 18, is DENIED.

2. Defendants' motion for summary judgment, Dkt. 26 and Dkt. 61, is GRANTED IN PART and DENIED IN PART. Defendants' motion is granted on all claims except for the following:

   - Plaintiff's retaliation claims against defendant Swiekatowski for monitoring his communications, confiscating legal materials, and planting cocaine in his urine sample.

   - Plaintiff's Fourth Amendment claims against defendants Menning and Stevens.

3. Defendants Ericksen, Baenen, Doe, Rowe, Mason, Schultz, Mohr, Facktor, Cole, Process, and Bruns are DISMISSED from the case.

4. The clerk of court is directed to set this case for a telephonic scheduling conference before the magistrate judge to set a trial date and associated pretrial deadlines.

Entered March 29, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge